COPY

1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   DALE F. KINSELLA (SBN 063370)
2    dkinsella@kwikalaw.com
   GREGORY P. KORN (SBN 205306)
3    gkorn@kwikalaw.com
   CHAD R. FITZGERALD (SBN 217551)
4    cfitzgerald@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
5  Santa Monica, California  90401
   Telephone: 310.566.9800
6  Facsimile: 310.566.9850

7  Attorneys for EUROPACORP

8
              UNITED STATES DISTRICT COURT
9
            CENTRAL DISTRICT OF CALIFORNIA
10

11
   EUROPACORP, a French corporation,      CASE NO.:  CV 10-02917
12
                Plaintiff,                 COMPLAINT FOR PRELIMINARY
13                                         INJUNCTIVE RELIEF
          vs.
14
   CONSOLIDATED PICTURES
15 GROUP, INC., a Nevada corporation,
   and DOES 1-10, inclusive,
16
                Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

10283.00001/51824.2

COMPLAINT

Plaintiff EuropaCorp alleges as follows:

## INTRODUCTION

1.     EuropaCorp is a major French motion picture studio based in Paris that produces and distributes internationally-renowned feature films throughout the world, including in the United States. EuropaCorp is the producer of the feature film *I Love You Phillip Morris*, starring Jim Carrey and Ewan McGregor (hereinafter, the "Picture"). EuropaCorp owns all right, title, and interest in and to the Picture and holds a registered copyright in the work.

2.     Defendant Consolidated Pictures Group, Inc. ("CPG") was licensed the right to theatrically release and distribute the Picture in North America (the United States and Canada), but it has materially breached the parties' license agreement by failing to pay a single dollar toward the $3 million advance owed to EuropaCorp. The license agreement explicitly authorizes EuropaCorp to rescind the contract and all of CPG's rights thereunder in the event of CPG's failure to timely pay any part of the advance. After giving CPG ample time to cure its breach, EuropaCorp was left with no choice but to rescind and seek an alternative distributor for the Picture.

3.     Despite EuropaCorp's valid rescission of the license agreement, CPG refuses to acknowledge that it no longer has rights in the Picture. CPG has refused to return the Picture and all related materials and film elements. It has refused to terminate sub-distribution agreements that it executed. Further, CPG continues to hold itself out (falsely) as the distributor of the Picture—releasing statements to the media and through industry-related websites that it intends to move forward with the theatrical release and distribution of the film.

4.     CPG is in breach of the parties' license agreement, and its threats to move forward with the release and distribution of the Picture blatantly infringe EuropaCorp's copyright. CPG's actions have placed a cloud over the Picture and frozen EuropaCorp's ability to exploit the work. EuropaCorp cannot attract a new distributor for the Picture while CPG continues to wrongly claim rights in the film,

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  nor could EuropaCorp deliver a clean chain of title even if it did attract a distributor.

2  Absent this Court's issuance of a preliminary injunction, EuropaCorp's theatrical

3  release and exploitation of its own Picture will be paralyzed, and the film will be

4  irreparably damaged.

5  ## JURISDICTION AND VENUE

6  5.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a),

7  in that some of the claims arise under the United States Copyright Act.  Jurisdiction

8  is further proper pursuant to 28 U.S.C. § 1332 because the value of the matter in

9  controversy exceeds the sum of $75,000, exclusive of interest and costs, and the

10  action is between a citizen of a State and a citizen of a foreign state.

11  6.    Venue in this Judicial District is proper under 28 U.S.C. § 1391(b)

12  because CPG resides in this Judicial District and a substantial part of the events or

13  omissions giving rise to EuropaCorp's claims occurred in this Judicial District.

14  ## THE PARTIES

15  7.    EuropaCorp is, and at all relevant times was, a corporation organized

16  and existing under the laws of France, with its principal place of business in Paris,

17  France.

18  8.    EuropaCorp is informed and believes, and based thereon alleges, that

19  CPG is, and at all relevant times was, a corporation organized and existing under the

20  laws of Nevada with its principal place of business in West Hollywood, California.

21  9.    EuropaCorp is unaware of the true names and capacities of the

22  defendants sued herein as Does 1 through 10, inclusive, and therefore sues these

23  defendants by fictitious names.  EuropaCorp will seek leave of this Court to amend

24  this Complaint to allege their true names and capacities when ascertained.

25  EuropaCorp is informed and believes, and based thereon alleges, that each

26  fictitiously named defendant is responsible in some way for the acts, occurrences,

27  and events alleged in this Complaint and is liable to EuropaCorp therefor.

28  10.    CPG and Does 1 through 10, inclusive, are at times referred to herein

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   collectively as "Defendants."

2       11.   EuropaCorp is informed and believes, and based thereon alleges, that

3   each of the Defendants was the agent or employee of each other Defendant and was

4   acting within the scope of such agency or employment at all relevant times.

5               **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

6       12.   EuropaCorp owns all right, title, and interest in and to the Picture and is

7   the owner of U.S. Copyright Registration No. PAu003443671 covering the Picture.

8   A true and correct copy of a print-out from the U.S. Copyright Office's website

9   relating to EuropaCorp's registration is attached hereto as Exhibit A.

10      13.   In an agreement dated as of May 8, 2009, EuropaCorp licensed to CPG

11  all domestic distribution rights in the Picture, including all theatrical, home video,

12  and television rights (hereinafter, the "License Agreement").  A true and correct

13  copy of the License Agreement is attached hereto as Exhibit B.

14      14.   The License Agreement required CPG, *inter alia*, to pay an advance to

15  EuropaCorp of $3 million, payable in three $1 million installments to occur (1) upon

16  CPG's receipt of certain written materials, (2) upon the "Delivery" of the Picture to

17  CPG, and (3) no later than 10 days prior to the initial theatrical release.

18      15.   The License Agreement expressly conditioned CPG's rights on its

19  payment of the $3 million advance—permitting EuropaCorp to rescind the

20  agreement entirely should CPG fail to make any of the installment payments.  To

21  that end, Paragraph 18 of the License Agreement provided in pertinent part: "[I]f

22  CPG fails to pay any portion of the Advance and such failure to pay is not based on

23  a material breach of this Agreement by [EuropaCorp] as alleged by CPG in good

24  faith . . . then [EuropaCorp] shall have the right to rescind the Agreement . . . ."

25      16.   Paragraph 18 of the License Agreement provides for disputes "related

26  to the delivery of the Picture by Grantor" to be arbitrated with the Independent Film

27  & Television Alliance ("IFTA"), but the arbitration provision provides, consistent

28  with California and federal law, that the parties may seek "interim relief," such as

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   preliminary injunctions, in a court or other forum.

2         17.    Following the execution of the License Agreement, EuropaCorp

3   delivered the Picture and all required elements to CPG.  A true and correct copy of

4   the delivery schedule reflecting those items delivered to CPG is attached hereto as

5   Exhibit C (hereinafter, the "Delivery Schedule").  As reflected in that Delivery

6   Schedule, CPG received and has in its possession an enormous amount of film and

7   music "elements"—materials which would allow CPG to print and distribute the

8   Picture—as well as extensive publicity and advertising materials including still

9   photographs and press kits.  CPG's counsel acknowledged in writing that delivery

10  was complete and in accordance with the License Agreement.

11        18.    A dispute between the parties as to the timing of delivery was resolved

12  and the parties executed an Amendment to the License Agreement dated as of

13  February 25, 2010, a true and correct copy of which is attached hereto as Exhibit D

14  (hereinafter, the "Amendment").  The Amendment released and waived any and all

15  claims CPG might have against EuropaCorp concerning delivery, stating in

16  pertinent part: "CPG acknowledges that delivery of the Picture has been completed

17  and hereby fully releases and discharges [EuropaCorp] from any and all claims,

18  known or unknown, arising from any delay in completing such delivery (and waives

19  the benefit of § 1542 of the California Civil Code in connection with such claims to

20  the fullest extent of the law)."  The Amendment also reiterated and restated CPG's

21  obligation to pay the $3 million advance and set forth a new payment schedule: (1)

22  the first installment of $1 million was to be paid immediately upon execution of the

23  Amendment; (2) the second installment of $1 million was to be paid upon CPG

24  obtaining certain third-party funds but no later than 30 days after the first

25  installment was due; and (3) the third installment of $1 million was to be paid no

26  later than 60 days following the first installment payment and, at the latest, April 30,

27  2010.

28        19.    CPG failed to make both the first and second installment payments of

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  $1 million as required by the License Agreement despite repeatedly assuring

2  EuropaCorp that it was obtaining the necessary capital to do so.  While expressly

3  reserving all rights in writing, including its right of rescission, EuropaCorp allowed

4  CPG additional time to make the installment payments.  Nevertheless, after weeks

5  of assurances from CPG that the payments were forthcoming, neither the first or

6  second $1 million installment were paid to EuropaCorp.  To date, CPG has not paid

7  any money to EuropaCorp.

8      20.    On April 1, 2010, in accordance with the License Agreement, counsel

9  for EuropaCorp sent CPG a letter providing notice of rescission for CPG's failure to

10  make the installment payments toward the $3 million advance.  The letter advised

11  CPG that, as it no longer held any rights in the Picture, any public screenings of the

12  film and any attempts to distribute or sub-distribute the film would constitute

13  copyright infringement.  In subsequent correspondence, EuropaCorp further

14  requested that the Picture and all delivery materials be returned.

15      21.    Notwithstanding the fact that Paragraph 18 unambiguously gives

16  EuropaCorp a right to rescind, CPG's counsel claimed that EuropaCorp had no right

17  to rescind the License Agreement as the result of CPG's failure to pay the advance.

18  Further, notwithstanding the fact that CPG's transactional counsel confirmed in

19  writing that delivery was complete and the Amendment released and discharged any

20  and all claims relating to delivery, CPG's litigation counsel claimed that

21  EuropaCorp could not rescind the License Agreement because it had allegedly failed

22  to timely deliver the Picture.

23      22.    Adding insult to injury, on April 15, 2010, CPG's litigation counsel

24  filed an IFTA arbitration demand against EuropaCorp.  CPG once again buried its

25  head in the sand:  The arbitration demand alleges that EuropaCorp is in material

26  breach of the License Agreement by failing to timely deliver the Picture, despite that

27  CPG's counsel acknowledged in writing that delivery was complete, and the

28  Amendment acknowledges that delivery is complete and releases and discharges all

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   claims against EuropaCorp with regard to delivery.

2          23.    Defendants continue to act as though CPG were the distributor of the

3   Picture in spite of the rescission of the License Agreement.  Defendants have

4   refused to return the film and music elements, publicity materials, and other items

5   delivered to CPG.  Defendants continue to maintain a website

6   (phillipmorristhemovie.com) in which they are publicly exhibiting a trailer for the

7   Picture (along with a credit for CPG spliced into scenes from the film).  They have

8   refused to terminate the sub-distribution agreements that CPG executed in

9   connection with the Picture.  On information and belief, Defendants continue to

10  identify CPG as the domestic distributor of the Picture to these sub-distributors and

11  continue to allow them access to film and music elements for use in manufacturing

12  copies of the film.  Defendants have made public statements to the press in which

13  they assert that CPG remains the distributor of the Picture and will move forward

14  with its release and distribution—statements which, on information and belief,

15  Defendants knew would interfere with EuropaCorp's ability to attract a new

16  distributor.  Further, EuropaCorp is informed and believes, and based thereon

17  alleges, that Defendants in fact intend to release and distribute the Picture as they

18  have publicly claimed.

19         24.    CPG has materially breached the License Agreement by failing to pay

20  any portion of the advance and refusing to comply with the rescission provision.

21  Moreover, Defendants' public exhibition of the Picture on their website, and their

22  threatened unauthorized distribution of the Picture, constitute blatant copyright

23  violations.

## FIRST CAUSE OF ACTION

### (Copyright Infringement – Against All Defendants)

26         25.    EuropaCorp realleges and incorporates by reference the allegations

27  contained in Paragraphs 1 through 24 as though fully set forth herein.

28         26.    EuropaCorp owns a valid copyright in the Picture.  The matter

10283.00001/51824.2

1   contained within such copyrighted work is wholly original and copyrightable subject
2   matter.

3       27.    By virtue of EuropaCorp's valid rescission of the License Agreement,
4   CPG's license of rights in the Picture is null.  CPG has no rights in the Picture
5   whatsoever, including with respect to the public exhibition or distribution of the
6   Picture in any media.

7       28.    EuropaCorp is informed and believes, and based thereon alleges, that
8   Defendants are infringing or threatening to infringe EuropaCorp's copyright rights
9   as alleged above.

10      29.    EuropaCorp is informed and believes, and based thereon alleges, that
11  Defendants' acts of infringement and/or threatened infringement have been taken on
12  behalf of CPG and in the course of their employment or agency with CPG.
13  EuropaCorp is further informed and believes, and based thereon alleges, that CPG
14  has a direct financial interest in the acts of copyright infringement alleged herein.

15      30.    Defendants' copyright infringement as alleged herein has caused or will
16  cause irreparable harm to EuropaCorp which cannot be fully compensated by
17  money.  EuropaCorp no adequate remedy at law and is entitled to preliminary
18  injunctive relief to enjoin CPG and its employees and agents from their threatened
19  or actual infringement of EuropaCorp's copyrighted work.

20                  **SECOND CAUSE OF ACTION**
21          **(Specific Performance of Contract – Against CPG)**

22      31.    EuropaCorp realleges and incorporates by reference the allegations
23  contained in Paragraphs 1 through 30 as though fully set forth herein.

24      32.    As of the time of execution, the License Agreement and Amendment
25  were valid and enforceable contracts.

26      33.    CPG materially breached the License Agreement (as amended) by
27  failing to pay any portion of the $3 million advance owed to EuropaCorp, including
28  failing to pay the first two installments of $1 million (each) as required by the

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1 License Agreement and Amendment.

2     34.    EuropaCorp validly provided notice of rescission of the License

3 Agreement (as amended) in its April 1, 2010 letter, in that Paragraph 18 of the

4 License Agreement explicitly authorizes EuropaCorp to rescind the agreement "if

5 CPG fails to pay any portion of the Advance."

6     35.    CPG has breached the rescission provision of the License Agreement as

7 alleged above, including without limitation by refusing to return the delivery

8 materials provided to it, by continuing to publicly exhibit the Picture, by continuing

9 to hold itself out as the distributor of the Picture, by refusing to revoke sub-

10 distribution agreements, and by permitting its sub-distributors continued access to

11 the Picture.

12     36.    EuropaCorp has performed all of its obligations under the License

13 Agreement (as amended) except as waived, excused, or prevented by the conduct of

14 CPG.

15     37.    Because of the nature of the License Agreement and the intellectual

16 property rights at issue, monetary damages are an inadequate remedy at law.

17 EuropaCorp will be irreparably harmed absent specific enforcement of the License

18 Agreement's rescission provision, which dictates that CPG cease purporting to act

19 as distributor of the Picture and cease any efforts to distribute the Picture.

20 Accordingly, EuropaCorp is entitled to injunctive relief enjoining CPG's material

21 breach of the rescission provision.

22     WHEREFORE EuropaCorp prays for judgment as follows:

23     1.    For a preliminary injunction:

24         a.    requiring that CPG and its respective officers, agents, employees,

25         partners, subsidiaries, attorneys and representatives, and all those

26         acting or attempting to act in concert with them, turn over to

27         EuropaCorp:

28         (i)    all materials and elements relating to the Picture provided

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

to CPG by EuropaCorp, including without limitation all materials listed on the Delivery Schedule; and

    (ii)    all materials relating to the Picture created by CPG or its sublicensees, including without limitation all materials relating to any trailer and advertising for the Picture;

  b.  restraining and enjoining CPG and its respective officers, agents, employees, partners, subsidiaries, attorneys, and representatives, and all those acting or attempting to act in concert with them, from directly or indirectly:

    (i)    Publicly displaying the Picture, including without limitation in screenings;

    (ii)    Making copies of the Picture;

    (iii)    Distributing, licensing, or attempting to distribute or license the Picture in any media;

    (iv)    Negotiating or attempting to negotiate agreements regarding the distribution, exhibition, or exploitation of the Picture;

    (v)    Publicly identifying CPG as the distributor of the Picture, or otherwise representing to third parties that CPG has rights in the Picture; and

    (vi)    Otherwise exploiting or attempting to exploit any of the applicable copyright rights enumerated in the U.S. Copyright Act, 17 U.S.C. § 106.

  2.  For an award of reasonable attorneys' fees and costs; and

///
///

1      3.     For such other and further relief as the Court deems just and proper.

2

3   DATED: April 20, 2010        KINSELLA WEITZMAN ISER KUMP &

4                                   ALDISERT LLP

5

6                  By: _____

7                      Gregory P. Korn
                      Attorneys for EUROPACORP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# EXHIBIT A

# Copyright
United States Copyright Office

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = i love you phillip morris
Search Results: Displaying 1 of 5 entries



## *I LOVE YOU PHILLIP MORRIS.*

**Type of Work:** Motion Picture
**Registration Number / Date:** PAu003443671 / 2010-01-21
**Application Title:** I LOVE YOU PHILLIP MORRIS.
**Title:** I LOVE YOU PHILLIP MORRIS.
**Description:** Videodisc (DVD)
**Copyright Claimant:** EUROPACORP, Transfer: by written agreement. Address: 137 rue du Faubourg Saint Honore, Paris, 75008, France.
**Date of Creation:** 2009
**Authorship on Application:** SEA SIDE FILM COMPANY, employer for hire; Domicile: United States. Authorship: entire motion picture.
**Rights and Permissions:** EUROPACORP, 137 rue du Faubourg Saint Honore, Paris, 75008, France
**Copyright Note:** C.O. correspondence.
**Names:** EUROPACORP
SEA SIDE FILM COMPANY



| Save, Print and Email (Help Page) |
| Select Download Format | Full Record | Format for Print/Save |
| Enter your email address: | | Email |

| Help | Search | History | Titles | Start Over |

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# EXHIBIT B

<u>LICENSE AGREEMENT -- "I LOVE YOU PHILLIP MORRIS"</u>

As of May 8, 2009

The following sets forth the principal terms of agreement ("Agreement"), as of the date above, between Consolidated Pictures Group, Inc. ("CPG") and EuropaCorp. ("Grantor") with respect to the distribution of the motion picture currently entitled, "I Love You Phillip Morris" ("the Picture").

1. <u>Territory</u>:  As used herein, "Territory" shall mean the U.S. and Canada, and all of their territories and possessions, (including, without limitation, Puerto Rico, the U.S. Virgin Islands, Guam, Bermuda, Saipan, American Samoa and the Caroline Islands, Nassau, Bahamas, Saba Island, St. Eustatius Island, St. Kitts Island, St. Martin Island, Baker Island, Marshall Islands, Northern Marianas, Wake Island, and Freeport – television rights in the territories listed in this parenthetical are non-exclusive except in Puerto Rico and US Virgin Islands). The Territory shall include all diplomatic posts and military and government installations of the U.S. and Canada, wherever located, all ships principally operating from or serviced from the Territory, all oil rigs flying the flag of any part of the Territory, and all aircraft flying the flag of any country worldwide. Distribution of the entire Picture by CPG, Grantor or any third party by means of the Internet shall not be permitted unless and until CPG and Grantor approve the applicable geo-filtering technology.

   A. <u>International Holdback</u>:  Grantor shall not release or authorize the release of the Picture to home video/DVD in Japan or Mexico prior to the earlier of (1) the home video/DVD release in the US, and (2) September 15, 2010.

2. <u>Rights Granted to CPG by Grantor</u>:  On an exclusive basis, Grantor hereby grants to CPG all distribution rights with respect to the Picture in all media, whether now known or hereinafter devised, within the Territory including, without limitation, all forms of theatrical, all forms of home video (including, without limitation, videocassettes, DVD, 8mm, laser, optical, linear, and all other disk and other video devices now known or hereafter devised), all forms of television now known or hereafter devised (including, without limitation, pay cable, pay-per-view, basic cable, syndication, satellite and free TV), video-on-demand, near video-on-demand, syndicated video-on-demand, all forms of non-theatrical rights now known or hereafter devised (including, without limitation, airlines, ships, oil rigs, hospitals, universities, colleges, hotels and armed forces bases), all on-line rights (including, without limitation, internet, webcasting and video streaming rights), all clip rights, all merchandising rights, and all customary allied and ancillary distribution-related rights (collectively, the "Rights"). All other rights, including, without limitation, music publishing rights, soundtrack album rights, screenplay publication rights (except that Grantor may use excerpts of up to 7,500 words in connection with advertising, marketing and promoting the Picture), novelization rights and subsequent-production rights (except as set forth below) are reserved by Grantor ("Reserved Rights").

a. In the exercise of the Rights, CPG shall have the right, without limitation, to do the following: to use the title(s) by which the Picture is or may be known or identified and, subject to Grantor's approval (such approval to be exercised in consultation with CPG's marketing consultants and Jim Carrey); to make such dubbed and subtitled versions of the Picture and the trailers thereof, including but not limited to, cut-in, synchronized and superimposed versions thereof, in any and all languages for use in such parts of the Territory as CPG may deem advisable; to permit commercial messages to be exhibited or broadcast before, during and/or after the exhibition of the Picture; to use, license and authorize others to use the name, likeness and voice (and any simulation or reproduction of any thereof including still photographs from or relating to the Picture) of any party rendering services or granting rights in connection with the Picture for the purpose of advertising, marketing, publicizing or exploiting the Picture or CPG, subject to contractual restrictions in favor of any such party, provided that Grantor shall have notified CPG of said provision as part of delivery hereunder; and the non-exclusive right to assert, prosecute, handle and settle in any and all parts of the Territory, all claims or actions or causes of action against any and all persons for the unauthorized or illegal use, copying, reproduction, release, distribution, exhibition or performance of the Picture or any part or version thereof, any of the Rights granted to CPG pursuant to this Agreement, or for the enforcement or protection of all or any Rights herein granted.

b. CPG or its designee will account for merchandising rights with respect to the Picture in a separate pot (i.e., not cross collateralized with any other Rights) and pay to Grantor 50% of all merchandising revenue it receives therefrom after deduction of all actual third party fees and costs, in accordance with its accounting and payment obligations set forth in Paragraphs 20 and 21 below. For clarity, the Advance (as defined below) is not recoupable out of such merchandising revenue. Any merchandising royalty payments to performers or other third parties shall be borne exclusively out of Grantor's share of merchandising revenues.

c. CPG shall also have an exclusive right of first refusal (for not less than 10 business days) and last matching right (for not less than 5 business days) to option and/or purchase all distribution Rights within the Territory in connection with any derivative audio-visual production (e.g., sequel, prequel, remake, TV pilot and/or series, TV movie, TV mini-series, live stage production), and Grantor's exploitation of any subsequent production shall be subject to a two (2) year holdback in each instance (unless CPG agrees in writing to waive or revise such holdback), commencing with the initial US release of the Picture.

3. <u>Theatrical Release Commitment</u>: CPG or its designee shall spend no less than US $6 million on prints and advertising ("P&A") in connection with the initial theatrical release of the Picture. CPG further agrees that it will not spend more than US$8.5 million on P&A in connection with the theatrical release of the Picture without first obtaining written (i.e., by fax or email, or by phone confirmed by CPG via fax or email) approval from Grantor. For purposes of approvals and consultations in this paragraph, Pierre-Ange Lepogam shall act on behalf of Grantor. Grantor shall have 48 hours from receipt of CPG's written request within which to send CPG written notice of any objection

13

("Objection Notice") it has to spending more than US$8.5 million on P&A for the initial theatrical release of the Picture and CPG agrees to consult in good faith with Grantor regarding those objections. Grantor's right of approval in this regard will apply to each occasion (e.g., week-to-week), if any, when CPG requests that P&A spending exceed $8.5 million. If Grantor fails to provide such Objection Notice within such 48 hour period, then Grantor automatically shall be deemed to have approved of such P&A expenditure in excess of $8.5 million. Notwithstanding the foregoing in this paragraph, if Grantor has not provided CPG with an Objection Notice within 24 hours from receipt of CPG's written request during the first, second and third weekends following the start of the Picture's theatrical release, then CPG shall be free on such three (3) weekends to spend up to an additional $2 million on P&A costs without having obtained Grantor's written approval. CPG presently intends to theatrically release the Picture in February 2010, with the exact date for the release to be determined by CPG in consultation with the mutually-approved marketing consultant (Matthew Cohen and Terry Press are pre-approved as marketing consultants). CPG agrees that the initial theatrical release shall not start later than March 15, 2010, subject to Grantor's timely Mandatory Delivery (as defined below) of the Picture, and subject to extension for any force majeure event that suspends or prevents the distribution of theatrical motion pictures in the Territory or in substantial parts thereof. CPG agrees to release the Picture on not less than 800 screens during its theatrical distribution of the Picture. To the extent required under Carrey's agreement, CPG shall consult with Jim Carrey in a meaningful fashion with respect to the marketing and distribution of the Picture. CPG will consult with Grantor in a meaningful fashion regarding the initial theatrical release pattern and initial theatrical advertising campaign for the Picture. In the event of any disagreement over any such matter, CPG's decision shall prevail. Except as expressly set forth above, CPG shall have complete, exclusive and unqualified discretion in terms of the manner, time and terms of distribution and exploitation of the Picture.

4.  Term; Distribution Expenses: The term of CPG's rights shall commence upon the execution of this Agreement and shall terminate fifteen (15) years from complete delivery of the Picture to CPG by Grantor ("Complete Delivery"). If CPG has not recouped its Outlay from its gross receipts during the Term, said Term automatically shall be extended for an additional five (5) consecutive years. As used herein, "Outlay" shall mean and refer to the aggregate, on a continuous and cumulative basis, of CPG's actual expenses in connection with the release of the Picture including without limitation (a) the Advance plus Interest (as defined below), (b) any Box Office Bonuses paid in accordance with Paragraph 6 below, and (c) all of CPG's P&A expenses, residuals expenses, and other actual distribution expenses (as commonly defined by major US motion picture distributors) (collectively, "Distribution Expenses") in connection with the Picture plus interest thereon at CPG's actual cost of funds.

5.  Advance: Grantor shall be entitled to receive the sum of US $3 million ("Advance"), payable as follows, subject to the following conditions:

    a.  US$1 million shall be paid by CPG to Grantor within ten (10) business days after the following have occurred: (i) the parties' execution of this Agreement (and all

exhibits hereto including the Mortgage of Copyright and Security Agreement attached hereto as Exhibit "C", and the Laboratory Access Letter attached hereto as Exhibit "B", which shall also be executed by the applicable laboratory and delivered to CPG prior to such payment); (ii) CPG's receipt and approval of the chain of title documentation (including without limitation all underlying literary material, life rights, screenplay rights, signed performer agreements for Jim Carrey and Ewan McGregor [including signed amendments in which Carrey and McGregor waive the right to any compensation - other than residuals - payable by any domestic distributor], and registration of screenplay and Picture with US Copyright Office); (iii) CPG's receipt and approval of signed quote confirmation letters (or other reasonably satisfactory evidence of Grantor clearing) and evidence of payment for all music rights including in-context advertising and promotional rights therein on a worldwide full buyout basis – i.e., no "step deals") for music in the final cut of the Picture (as determined in accordance with Paragraph 13 below); and, (iv) CPG's receipt of an E&O insurance certificate (in accordance with Paragraph 16 below). If Grantor has delivered items (i), (ii) and (iv) above to CPG but has not at such time delivered the items in (iii) above, then thereafter CPG shall pay such $1 million into a mutually-approved escrow account (CAA is approved as escrow holder) within ten (10) business days following the parties' execution of escrow instructions, and the $1 million shall be released to Grantor once CPG confirms receipt of all items required in (iii) above. If Grantor fails to deliver all items required in (iii) above within 90 days of the deposit of such $1 million with the escrow holder, then CPG shall have the right, upon written notice to the escrow holder, to terminate the Agreement and have such $1 million returned to CPG without need of consent from Grantor.

    b.  Subject to Grantor's satisfaction of the conditions in Paragraph 5(a)(i)-(iv) above, US$1 million within 10 business days following Grantor's timely Complete Delivery of the Picture; and,

    c.  US$1 million no later than 10 business days prior to the initial theatrical release of the Picture, provided that if Grantor has satisfied the conditions for payments under Paragraph 5(a) and 5(b) above and is not otherwise in uncured material breach hereof, CPG will pay Grantor the entire advance on or before October 31, 2009. Payments to Grantor under this Paragraph 5 shall be subject to extension in the event of any force majeure event affecting the US financial services/banking industry which prevents CPG from making such payments on a timely basis (i.e., a September 11, 2001, type of event which causes a substantial disruption in the banking system).

6.  **Box Office Bonuses:**  CPG will pay Grantor the following bonuses ("Box Office Bonuses") if and when the following levels of domestic (US and Canada) box office receipts ("DBO") for the Picture are reported in Daily Variety: at $20 million DBO, a bonus payment of $1 million; and, an additional $1 million bonus payment at each $5 million DBO thereafter, if applicable. Box Office Bonuses shall be paid within 30 days of the applicable Daily Variety report.

7. <u>Distribution Fees and Expenses; Grantor's Participation</u>:  From 100% of gross receipts received by CPG from exploitation of the Picture, CPG will deduct the following on a continuing and cumulative basis: (a) a distribution fee of 20% (provided that the aggregate distribution fees charged by CPG and Fox, or any other third-party distributor for home video, including, without limitation, DVD/cassette/VOD [if included in home video deal] ["Home Video Distributor"] shall not exceed 30%, and further provided that such 20% fee shall be inclusive of any fees charged by any sub-distributor other than the Home Video Distributor or the sub-distributor for non-theatrical rights (e.g., schools, military, airlines, ships, governmental); (b) next, it will deduct any and all of its Distribution Expenses, plus interest thereon at CPG's actual cost of funds; (c) next, it will deduct the Advance plus interest thereon at the then-existing prime rate plus 2% ("Interest").  Thereafter, all gross receipts received by CPG from exploitation of the Picture shall be deemed the "Net Proceeds" and shall be split 50/50 with Grantor; provided, however, that any and all Box Office Bonuses actually paid to Grantor shall be recouped by CPG out of (i.e., deducted solely from) Grantor's 50% of Net Proceeds.  All Rights granted to CPG (other than merchandising rights) are fully cross-collateralized.  Notwithstanding the foregoing in this paragraph, after such time (if any) as CPG has recouped 100% of such Advance plus Interest, and 100% of such Distribution Expenses plus Interest, then no distribution fee shall be payable to CPG.  No sub-distributor fees shall exceed 15%, except for the following: sub-distributor fees for airlines shall be capped at 17.5%, sub-distributor fees for ships shall be capped at 35% and sub-distributor fees for other non-theatrical rights shall be capped at 50%.  CPG agrees to sign or to cause its sub-distributors to sign customary SAG, DGA and WGA distributor's assumption agreements with respect to the Territory and Term, and to administer and pay guild residuals in connection with the distribution of the Picture in the Territory during the Term.

8. <u>Delivery to CPG</u>:  The version of the Picture to be delivered to CPG shall be the version which played at Sundance 2009 (i.e., such cut including the music therein) ("Grantor's Sundance Cut") unless CPG agrees in writing to accept delivery of a different version.  CGP acknowledges that nothing in this Agreement requires Grantor to clear and pay for any song or recording in the Sundance Cut if such song and recording is not used in the final cut of the Picture (as determined in accordance with Paragraph 13 below).  All items listed on the Delivery Schedule attached hereto as Exhibit "A" and incorporated herein by this reference shall be delivered to CPG by Grantor, at Grantor's sole cost and expense, not later than July 1, 2009 ("Delivery Date"), time being of the essence.  The items marked on such Delivery Schedule in red shall be deemed items required for mandatory delivery ("Mandatory Delivery") for purposes of Paragraph 3 above.  If Grantor fails to make Complete Delivery in timely manner, CPG has the right (in its sole discretion) to create any missing or defective delivery item and deduct the actual, direct cost thereof from the $1 million due under Paragraph 5(b) above, or to terminate this Agreement and (as a condition of granting the Rights back to Grantor) to recoup any and all sums paid to Grantor prior to such termination.  Grantor represents and warrants that all materials delivered pursuant to this Agreement shall be of first-class, technically-acceptable quality consistent with motion picture industry standards.

16

9. <u>Access to CPG Materials</u>: Grantor shall be entitled to free (other than paying the actual cost of shipping, duplication and insurance) access to all of CPG's marketing materials concerning the Picture (i.e., key art, trailers, television spots, etc.) (collectively, "the CPG Materials"), and shall be free to use such materials in connection with its exploitation of the Picture in all areas outside of the Territory. CPG shall be entitled to free (other than paying the actual cost of shipping, duplication and insurance) access to all of Grantor's or its foreign sales agent's marketing materials concerning the Picture (i.e., key art, trailers, television spots, etc.) and foreign language versions of the Picture, at 50% of such foreign sales agent's cost. Any costs incurred in the creation, duplication and/or shipping of such materials shall be at requesting party's sole expense.

10. <u>Airline and Television Versions</u>: If CPG creates airline and/or broadcast television versions of the Picture, then CPG shall recoup the cost thereof as a Distribution Expense and shall consult in good faith with the director(s) of the Picture with regard to such versions, subject to the director(s) being available as, when and where reasonably required by CPG and at no additional cost to CPG, with CPG's decision being final in each instance. CPG shall be responsible for creating such airline and/or broadcast television version, if needed, at its expense (as a recoupable Distribution Expense).

11. <u>Promotional Support</u>: Grantor will use its reasonable good-faith efforts to encourage the lead cast, the directors and the producers to participate in the promotional and publicity events and campaigns related to the Picture, and in interviews and commentary in connection with the DVD or other home entertainment version(s) of the Picture. Grantor hereby represents and warrants that it has obtained all of the necessary consents, clearances, agreements and documentation required in order for CPG to be permitted to employ the names and likenesses of all of the principal cast members in all of the publicity, promotion, marketing and advertising related to the Picture, subject to industry-standard contractual restrictions and limitations of which CPG is informed in writing on or before the Delivery Date. CPG agrees to comply with Grantor's contractual obligations to Jim Carrey and Ewan McGregor in connection with distribution of the Picture in the Territory (e.g., with respect to approvals, consultations and publicity) of which it has been advised in writing not later than the Delivery Date, but nothing in the foregoing shall be deemed an assumption of any obligation to pay any contingent compensation of any kind (other than SAG residuals) to Carrey or McGregor.

12. <u>Sub-Distributors</u>: CPG acknowledges that it shall engage Twentieth Century Fox (or its affiliate) to distribute Home Video Distribution rights. Before engaging any other distributor for Home Video Distribution rights, CPG shall obtain Grantor's prior written approval, not to be unreasonably withheld. CPG acknowledges that it intends to engage the following third parties: Freestyle to distribute the Picture theatrically and to handle TV sales within the Territory; and, EIM to distribute the Picture on airlines; provided, however, that CPG does not guarantee that it will engage or enter into agreement with any of such third parties, and if it does not engage or enter into agreement with any such third party, then it shall engage or enter into agreement with an equivalent company and CPG shall consult with Grantor regarding and prior to engaging such other company, and in the event of any disagreement, CPG's decision shall prevail.

13. Final Cut:  CPG shall have the right to determine the final cut of the Picture in the Territory, provided that in the case of a disagreement between CPG and Grantor regarding the final cut, CPG will arrange and pay (as a Distribution Expense) for a recruited test screening with an experienced consumer research and marketing firm (*e.g.*, NRG) for Grantor's Sundance Cut.  If CPG creates another version of the Picture ("CPG Cut") which Grantor does not favor as the final cut, then CPG will also arrange and pay (as a Distribution Expense) for a recruited test screening with an experienced consumer research and marketing firm (*e.g.*, NRG) for such CPG Cut and Grantor's Sundance Cut, and the higher-testing cut of the two will be deemed the approved final cut of the Picture for theatrical and home video release (unless the parties agree otherwise).  CPG shall pay for all costs associated with creating the CPG Cut.   Grantor shall have the right to elect to have a subsequent Grantor-created cut of the Picture (i.e., a cut made by Grantor, at Grantor's expense, after Grantor's Sundance Cut) tested instead of Grantor's Sundance Cut, but for avoidance of doubt, Grantor shall be solely responsible for all costs associated with delivering such other cut to CPG (including, without limitation, fully paying for any and all music in such other cut).  Notwithstanding the above, but subject to the director's rights under the DGA Basic Agreement, CPG has right to edit the Picture (in consultation with Grantor, if Grantor is available at no additional cost to CPG) for purposes of TV timing/formatting, pan & scan, rating and censorship.

14. Credits:  Provided the credits are in accordance with Grantor's contractual and guild obligations, CPG shall not change the credits of the Picture as delivered to it by Grantor; provided, however, that CPG shall have the right to add its and its sub-distributors' animated and static logos (as applicable) and to add a presentation card (for CPG and/or its sub-distributor[s]) to the front of the Picture (i.e., such logos and card shall appear before the existing credits) in the Territory and in all advertising, promotional and marketing materials for the Picture in the Territory.

15. Awards Campaign:    CPG agrees to spend not less than US$50,000 (inclusive of the cost of sending out not less than 6,000 Academy Award screeners to Academy members in the year in which the Picture is initially released) in promoting the Picture and the individuals who made the Picture for Academy Award consideration.

16. E&O:  Grantor agrees to name CPG and all of its principals, parents, subsidiaries and affiliates as additional insureds under Grantor's E&O insurance policy for the Picture.  Grantor's E&O policy shall be free of any exclusions, shall provide CPG with 30 days notice of cancellation or modification, and shall have limits of liability of not less than US$3 million per occurrence and $5 million in the aggregate with a deductible of not more than US$25,000.  The policy term shall be not less than three (3) years from Delivery.

17. Grantor's Representations and Warranties; Indemnification:  Grantor represents and warrants as of the date hereof and also upon Delivery of the Picture that: (a) Grantor exclusively owns or controls all Rights granted to CPG under this Agreement and that all such Rights are free of all liens, claims, charges, grievances, encumbrances, restrictions,

and commitments, and all costs of production (including, without limitation, all compensation, laboratory costs, license fees, royalties, and any and all music costs and/or licenses) have been paid in full and clearance of elements contained therein (including, without limitation, music on an "in-context" basis) has been secured for use by CPG for the full extent of all Rights granted herein; (b) with respect to the Territory, Grantor has no other agreement for license or distribution with any other person or entity with respect to the Picture which may conflict or interfere or be inconsistent with any of the provisions of this Agreement or the enjoyment by CPG of the rights granted to it hereunder; and (c) neither the Picture, nor any part thereof, nor any materials contained therein or synchronized therewith, nor the title thereof, nor the exercise of any Right, license or privilege granted to CPG hereunder, violates or will violate, infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly competes with or slanders or libels or places in a false light (or constitutes a trade disparagement of) any person or entity whatsoever. Without limiting the generality of the foregoing, Grantor represents that no claims relating to the Picture have been made by Philip Morris. Except with respect to residuals due to SAG, DGA and WGA, Grantor shall be solely responsible for paying any additional payments, including, without limitation, union or guild residuals or supplemental market payments required, profit participations, music payments or any other amounts arising as a result of CPG's exploitation of the Rights granted hereunder (however, Grantor represents and warrants that all such items shall be fully and appropriately cleared and paid for to the full extent of the Rights licensed to CPG hereunder). Grantor shall indemnify, defend and hold CPG, its parent, subsidiary and affiliated companies, and its respective successors, licensees, distributors, and assigns and their respective officers, directors, shareholders, employees, attorneys, agents and other representatives from and against any and all claims, actions, suits, judgments, obligations, damages, losses, penalties, liabilities, costs and expenses (including, without limitation, reasonable fees and disbursements of outside counsel) of whatsoever kind and nature (collectively "Claims") imposed on, incurred by, or asserted against CPG in any action, claim or proceeding between CPG and Grantor or between CPG and any third party or otherwise, arising out of or in connection with the exercise of any of the Rights granted herein or out of any breach by Grantor of any representation, warranty, covenant or other provision hereof. CPG shall indemnify, defend and hold Grantor harmless from any third party Claims imposed on, incurred by, or asserted against Grantor in any action, claim or proceeding arising out of or in connection with the distribution of the Picture (or any ancillary rights therein) by CPG (except to the extent covered by Grantor's indemnification of CPG above).

18. Limitation of Remedies: Grantor waives any right to rescind this Agreement or to seek equitable or injunctive relief and agrees that its sole remedy for any breach by CPG will be an action at law for direct compensatory damages; provided, however, that (a) if CPG fails to pay any portion of the Advance and such failure to pay is not based on a material breach of this Agreement by Grantor as alleged by CPG in good faith, or (b) if CPG fails to release the Picture on a timely basis following Grantor's timely delivery of the Picture

and Grantor is not otherwise in material breach, then Grantor shall have the right to rescind this Agreement but no such rescission shall be effective unless and until Grantor has fully repaid CPG for any portion of the Advance paid prior to such rescission. Any dispute related to the delivery of the Picture by Grantor, which cannot be resolved after good faith negotiation between the parties, shall be resolved through expedited, final and binding arbitration under the Independent Film and Television Alliance (IFTA) Rules for International Arbitration in effect as of the date of this Agreement ("IFTA Rules"). Each party waives any right to adjudicate any dispute in any other court or forum, except that a party may seek interim relief before the start of arbitration as allowed by the IFTA Rules. The Arbitration will be held in Los Angeles, CA. The parties will abide by any decision in the arbitration and any court having jurisdiction my enforce it. The Parties submit to the jurisdiction of the courts in Los Angeles, CA, with respect to interim relief, to compel arbitration or to confirm an arbitration award. The Parties agree to accept service of process in accordance with the IFTA Rules and agree that service in accordance with the IFTA Rules satisfies all requirements to establish personal jurisdiction over the Parties. In the case of any dispute under this Agreement, in addition to any damage award or other remedy, the prevailing party will be entitled to recover its reasonable outside attorneys' fees.

19. Miscellaneous: This Agreement shall be construed and interpreted pursuant to the Laws of the State of California applicable to agreements entered into and fully performed in California. Venue for any action shall be Los Angeles, CA. This Agreement expresses the entire agreement and understanding of the parties with respect to the matters set forth herein and supersedes all prior agreements, negotiations, drafts and understandings amongst the parties pertaining to the subject matter hereof. No modification of this Agreement shall be valid or binding unless in writing and executed by both parties. This Agreement may be signed in counterparts and each such counterpart shall constitute an original document, and all such counterparts, taken together, shall constitute one and the same instrument. Counterparts delivered by facsimile or by email shall have the same force and effect as an original. If a provision of this Agreement is prohibited or invalidated under applicable law, the remainder of the Agreement shall remain unaffected. Grantor may not make any assignment of any of its rights or obligations under this Agreement, unless it has obtained the prior written consent of CPG.

20. Reporting Rights: Grantor shall have the right to receive accounting statements (and any payment due thereunder) quarterly for the first two (2) years after the initial theatrical release of the Picture; thereafter semi-annually for four (4) years; and, thereafter, annually. Statements and payments (if any) shall be delivered no later than 60 days after the end of each reporting period. Grantor shall have the right receive copies of accounting statements from any sub-distributor of the Picture if such statements relate only to the Picture; if such statements relate to more than one Picture, Grantor shall receive the portion of such statements concerning the Picture (redacted as needed to avoid showing information about any other picture).

21. Audit: Grantor shall have the right to audit CPG's books and records for the Picture only. Any audit shall occur no more than once per year, upon reasonable notice, using a

20

CPA or experienced motion picture auditor only.  Any statement shall be deemed final, correct and not subject to audit if no objection thereto is received by CPG within two (2) years of the issuance of such statement.  If Grantor wishes to audit any CPG sub-distributor and CPG does not wish to initiate and pay for such audit, then Grantor may cause CPG to initiate such audit by directly paying for the cost of such audit, and in such instance Grantor may recoup its reasonable audit costs out of any recovery paid by the sub-distributor as a result of such audit.  In the event any audit reveals any overpayment to Grantor, then Grantor agrees to repay such overpaid amount to CPG within 30 days of receipt of the audit report.

22. <u>Confidentiality; Publicity</u>:  The terms of this Agreement shall be deemed confidential and Grantor shall not disclose such terms to any third party without CPG's prior written consent in each instance, except where disclosure is required by subpoena or otherwise required by law, and except for disclosure to Grantor's representatives (who shall also treat the terms of this Agreement as confidential).  Neither Grantor nor its representatives shall issue or authorize any publicity (including without limitation any press release) regarding this Agreement or regarding the Picture in the Territory during the Term without CPG's prior written consent in each instance.  The parties shall mutually approve the initial press release concerning this Agreement.

AGREED TO AND ACCEPTED BY:

CONSOLIDATED PICTURES GROUP, INC. ("CPG")                    EUROPACORP ("Grantor")

By _Timothy Patrick Cavanagh_                                By _____

Its _President_                                              Its _____

**21**

**Exhibit "B"**
Mortgage of Copyright and Security Agreement

**Exhibit "A"**
Delivery Schedule

**Exhibit "C"**
Laboratory Access Letter

# EXHIBIT C

DELIVERY SCHEDULE
Exhibit "A"

This Delivery Schedule is attached to and made part of that certain Agreement (the "Agreement") dated as of May 8, 2009, between **EUROPACORP** ("Grantor") and **CONSOLIDATED PICTURES GROUP, INC.** ("Licensee") with respect to the motion picture entitled: **"I LOVE YOU PHILLIP MORRIS"** (the "Picture"). All capitalized terms shall have the meaning assigned in the Agreement unless otherwise defined herein. Delivery of the Picture shall consist of Grantor making physical delivery, at the sole cost and expense of the Grantor, of the items set forth herein with respect to the Picture, in accordance with the standard set forth with respect to the applicable item herein and/or in the Agreement, or, if no standard is set forth with respect to the particular item, then acceptable in form, substance and/or content to the reasonable satisfaction of the appropriate personnel of Licensee or Licensee's designees. Where laboratory Access is granted to Licensee, Grantor shall use the Laboratory Access Letter substantially in the form of Exhibit "B", attached hereto. Delivery shall be made to such Delivery Locations as Licensee shall designate.

I.     **Picture Items: All feature film elements delivered to the Licensee shall not contain any language subtitles (including English language subtitles).** All materials must be conformed to the international version credits. Materials to be delivered to *Paul LaVoie at Fotokem, 2801 W. Alameda Ave., Burbank, CA 91505,* or such other address or individual as Licensee shall determine.

A.     Original Negative: A Laboratory Access Letter granting Licensee access to the original 35mm Negative of the Picture, which shall: be fully-cut, edited and assembled complete with credits and main, narrative (if any), end and all descriptive titles. Negative must conform in all respects to the final edited version of the action work print of the Picture. Negative shall be full frame (i.e., Grantor will not use a hard matte during photography). Negative shall not contain any physical damage, including, but not limited to, spots, scratches, abrasions, dirt, cracks or tears. Negative must be of first class technical quality and be ready and suitable for use in the printing of commercially acceptable positive prints. If the film was completed as a digital intermediate (DI), Licensee shall be granted access to the original 35mm digital intermediate negative from the original DI files.

B.     Interpositive Protection Master: One (1) 35mm fully timed color Interpositive Protection Master of the Picture, conformed in all respects to the Answer Print timing from the original "cut" Negative following Answer Print approval and before additional printing is done from the original "cut"

DelSched.05-08 06-29-09 10:11 AM 7:30 PM

Negative. If the Picture is in black and white, Grantor shall provide access to 1 x 35mm fully timed black and white fine grain protection master of the Picture, conformed in all respects to the Answer Print timing from the original "cut" Negative following Answer Print approval and before additional printing is done from the original "cut" Negative.

C.   Internegatives:  One (1) fully timed commercially acceptable 35mm color Internegatives made from the Color Interpositive Protection Master on estar base suitable for the manufacture of first-class technical quality release prints.

D.   Composite Positive Print:  One (1) first class 35mm Composite Positive Print of the theatrical version of the Picture fully cut, titled and assembled, with the soundtrack printed thereon in perfect synchronization throughout with the photographic action. The Print shall not contain any physical damage, including, but not limited to, spots, scratches, abrasions, dirt, cracks or tears. The quality of the picture image and soundtrack shall be first class.

E.   Optical Soundtrack Negatives:  One (1) 35mm Optical Soundtrack Negatives of the Picture on estar base in synchronization with the internegative with DOLBY (SR/SRD/SDDS or DTS if applicable) information included on one optical track with noise reduction requirements.

F.   35mm Check Prints:  One (1) 35mm composite color Check Prints corresponding to the Internegatives and Optical Soundtracks specified above.

G.   35mm Textless Backgrounds:  One (1) 35mm fully timed textless optical house original negative, interpositive and print of all title background material (textless) including main, end and explanatory title backgrounds (such as locales, translations, year, etc.). If applicable, a 35mm feature subtitled overlay shall be provided for all reels that contain dialogue in a language other than English.

H.   Subtitles:  If any portion of the Picture is in a language other than English, physical delivery of one 35mm feature subtitled overlay to create English subtitled prints with Item I.C. above, the internegative. Licensee shall also be granted laboratory access to the fully completed feature subtitled Interpositive and Internegative (if applicable).

I.   Feature Digital Cinema Distribution Master (DCDM) and Digital Cinema Package (DCP):  Access to the Digital Cinema Distribution Master (DCDM). DCDM master files should not be compressed, encrypted or packaged. In addition, delivery of one Digital Cinema Package (DCP) on a

separate hard drive. DCP files shall be encoded, encrypted and packaged for digital cinema presentation. The DCDM and DCP must be in the same ratio as that of the theatrical film release and both must comply with DCI standards. With the 5.1 sound mix across audio channels 1-6 as L, R, C, S, LS, RS (audio at 48KHz sample rate, 24 bits per sample (although 16 or 20 is acceptable) and reference level of −20dBFS.

J.   <u>Stereo Soundtrack – MO disk:</u>  2-track and 6-track Dolby Magneto Optical Disk (no noise reduction), a 6-track printmaster on uncompressed MO for SDDS mastering (no noise reduction), and DTS master CD.

K.   <u>DVD-R ProTools Stereo 2-Track and 6-Track Printmasters (6+2):</u> One (1) DVD-R containing the ProTools session of the Dolby Surround encoded stereo two-track printmaster and 6-track discrete printmaster of the original language dubbed soundtrack of the Picture ("printmaster") from which the stereo Optical Soundtrack Negative specified above (item I.D.) has been made.  Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames; Timecode: 29.97 Frames; Sample Rating: 48 KHZ; No Noise Reduction.  Channel configuration: CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Lt; CH8 – Rt.

L.   <u>DVD-R ProTools Stereo Dialogue/Music/Effects:</u>  One (1) DVD-R containing the ProTools session of the stereo discrete dialogue, music and effects made from the fully mixed dubbing stems, in perfect synchronization with the Original Picture Negative.

M.   <u>DVD-R ProTools Dialogue/Music/Effects stems:</u> One (1) DVD-R containing the ProTools session of each of the 6-track dialogue, music and effects stems used to manufacture the print master.  Effects stem must be fully filled and each stem must be in perfect synchronization with the original picture negative specified above (Item I.A).

N.   <u>DVD-R ProTools Stereo 2-Track and 6-Track Music & Effects (6+2):</u> One (1) DVD-R containing the ProTools session of the 2-track stereo mix and the fully mixed 5.1 Music and Effects Track Master, which shall contain fully mixed music and effects with the effects track completely filled with Foley and duplicating any production sound effects so that there are no effects whatsoever missing. Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames;  Timecode: 29.97 Frames; Sample Rating:  48 KHZ; No Noise Reduction.  Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.

O.   <u>DVD-R ProTools Conformed 5.1 Printmaster and 5.1 Music & Effects:</u> One (1) DVD-R containing the 5.1 Printmaster and one (1) DVD-R containing the 5.1 Music & Effects in perfect synchronization with the feature HDCAM-SR master (25fps, 48kHz, 16 bit, -20dbfs).

P.    DVD-R ProTools 4+2 Music and Effects Track: One (1) DVD-R containing the ProTools session of the stereo music and effects tracks configured Left, Center, Right, Surround on four tracks and extra material on track 5 with clean mono dialogue on track 6. The sound effects on this dub must be fully filled and mixed in perfect synchronization with the Picture negative specified above (Item I.A). The extra materials track shall contain any special sound elements peculiar to the film (e.g. foreign language dialogue, dialogue from on-screen television/radios/computers, grunts, groans, shouts etc.).

Q.    Firewire Drive Content: One (1) Firewire drive (external hard drive) containing all ProTools sessions indicated above.

R.    Multi-Track Recordings:  A Laboratory Access Letter with a detailed inventory list granting Licensee access to all original multi-track recordings of the original music score.

S.    Cut-outs/Trims/Lifts: ~~Delivery of a hi-resolution~~HD 1080 Quicktime files if available of all~~the lifted~~ ~~cut-outs, trims, positive trims, lifts and all other material photographed or recorded by Grantor in connection with the production of the Picture.  This would also include the 35mm work track (sound), work picture (action); all production dialogue; all sound effects units and pre-dubs; all music units and pre-dubs and all dialogue units and pre-dubs. Also, a Laboratory Access Letter with a detailed inventory list granting Licensee access to the original negative of above items.~~ scenes. Those scenes should include the scenes included in Grantor's Sundance Cut as well as any assembled scenes that Grantor proposes to include on the DVD extras.  If HD 1080 quality is not available then the scenes should be in the highest possible quality but nothing lower than 720 standard def.

(a) Access to the Editor's Lined Script and Editor's Code Book (or a legible copy of the original necessary to find trims and outtakes, or an electronic equivalent thereof).

T.    Alternate Film and Sound Material: Delivery of all "cover shots", alternate scenes/alternate dialogue so that the Picture can be conformed to rating, censorship requirements and/or television and airline exhibition (if available).

U.    Music Scoring Masters: Delivery of the Original (or digital copies of) multi-track music scoring masters.

V.    Music Cue Masters: Delivery of one (1) CD copy of all music cues used in the final picture (score and source) assembled in the order that they appear in the feature. All cues should be complete without dips or fades.

W.   ~~Foreign Language Masters: Delivery of all available Foreign Language~~
     ~~dubbed masters of the feature. [we need this for airlines deal and need~~
     ~~Spanish and French for all media]~~Foreign Language Masters:  If and when
     available on a "free" access basis (other than payment of customary
     shipping and duplication costs) from foreign distributors (but not
     necessarily by the delivery date), delivery of all available Foreign
     Language dubbed masters of the feature.

II.   **Video Items:**  Materials to be delivered to *Paul LaVoie at Fotokem, 2801
      W. Alameda Ave., Burbank, CA 91505,* or such other address or individual
      as Licensee shall determine.

      **Language subtitling: If any portion of the film contains any type of
      language subtitles (including English titles), Licensee shall receive
      the below video masters as both subtitled and un-subtitled.**

A.   One (1) HDCAM-SR (4:4:4) Color Corrected Telecine Transfer Master –
     4:3 1.33 aspect ratio – full frame. Manufactured from the theatrical 35mm
     interpositive or DI: Digital Intermediate files specified in section I.A above.
     Technical specifications: 23.98psf 1080 with Director and/or Director of
     Photography color timing approval for HD CRT (709). Panning
     and scanning is required if Picture is hard matted or Cinemascope.
     Include Textless Backgrounds :60 seconds after program. The time code
     for the textless background should match the timecode of the
     corresponding portion of the program and should be frame accurate. See
     below for audio configuration.

B.   One (1) HDCAM-SR (4:4:4) Color Corrected Telecine Transfer Master –
     16:9 (1.85 or 2.35*) aspect ratio – letter boxed. Manufactured from the
     theatrical 35mm interpositive or DI: Digital Intermediate files specified in
     section I.A above. Technical specifications – 23.98psf 1080 with Director
     and/or Director of Photography color timing approval for HD CRT (709)
     color profile. Include Textless Backgrounds :60 seconds after program.
     The time code for the textless background should match the timecode of
     the corresponding portion of the program and should be frame accurate.
     See below for audio configuration. * aspect ratio will be determined by the
     aspect ratio of the original shot negative.

C.   One (1) HDCAM-SR (4:4:4) Color Corrected Telecine Transfer Master –
     16:9 (1.78) Pan & Scan. Manufactured from the theatrical 35mm
     interpositive or DI: Digital Intermediate files specified in section I.A above.
     Technical specifications – 23.98psf 1080 with Director and/or Director of
     Photography color timing approval for HD CRT (709) color profile. Include
     Textless Backgrounds :60 seconds after program. The time code for the
     textless background should match the timecode of the corresponding
     portion of the program and should be frame accurate. See below for audio
     configuration.

DelSched.05-08~~06-29-09 10:11 AM~~7:30 PM
5

Audio Configuration for all HDCAM-SR (4:4:4) Mastering Elements listed above is as follows:

Channel 1 & 2: Stereo English Lt/Rt @ +12db
Channel 3 & 4: Stereo M/E Lt/Rt @ +12db (must be fully filled mixed)

Video format: The video format for the above referenced HDCAM-SR masters should be as follows:

(1.) All video masters must be recorded 1080p at 23.98psf, 4:4:4 (22:22:22) 10-bit sampling.
(2.) Continuous time code should begin at 00:57:00:00
(3.) First frame of program video on Part 1 starts at 01:00:00:00
(4.) First frame of video for subsequent parts should start at next frame of video after the last frame of video from the previous part (i.e., if part 1 ends at 01:50:25:01, part 2 should start at 01:50:25:02).
(5.) 60 seconds of color bars (SMPTE) with 1kHz tone @ 0.0VU (-20 dBFS) on all program audio channels starting at 00:58:00:00
(6.) 10-30 seconds of slate beginning at 00:59:00:00 – slate shall include the following information:

Feature Film Title
Version (i.e. Theatrical)
Record format (i.e. 23.98 – 4:4:4)
Aspect ratio (i.e.16:9 Letterbox 2.35)
Run time (without textless materials)
Date & Facility of origin
Audio configuration (as outlined above)
Part 1 of " " – if the master is a multiple part master

(7.) 60 seconds of color black with no audio following the end of program.


D.     Master Evaluation Quality Control Reports. Post production facility's QC reports should be included with the video masters. One copy of the final Master Video Technical Evaluation report as created by any pre-approved lab for each video master delivered. Should the evaluation prove that any of the master videotapes are not of acceptable quality, it is the Grantor's responsibility to repair any faults listed on the evaluation report. This evaluation report must be submitted prior to final acceptance. If there are any faults not corrected, a written explanation accompanying the evaluation must be accepted by Licensee.

E.   <u>NTSC Digital Masters:</u>  The following Digital Betacam down conversions shall be manufactured from the HDCAM-SR masters specified above (IV.A/B/C):

>Digital Betacam NTSC 4x3 1.33 full frame pan and scan
>Digital Betacam NTSC 16x9 1.85 or 2.35 letterbox (original aspect ratio)
>Digital Betacam NTSC 16x9 1.78 full frame

III.   **<u>Publicity and Advertising Items</u>:** All materials must be conformed to the international version credits.  Materials to be delivered to *Justin Lev at 626 La Loma Rd., Pasadena, CA 91105,* or such other address or individual as Licensee shall determine.

A.   <u>Unit Photography:</u>  All original RAW digital files, color transparencies, color negatives and contact sheets of all still photographs taken in connection with the Picture including special shoot photography. In no event shall Grantor deliver less than  100 pre-approved images or RAW digital files. All photography must note the name of the photographer. Any and all approvals or other authorizations that may be required in connection with Licensee's use of said photographs will be secured by Grantor and delivered to Licensee at the time Grantor delivers the respective photographs to Licensee.

B.   <u>Intentionally deleted</u>

C.   <u>Biographies:</u>  One (1) typewritten Biography (approved by the subject of the biography) of each of the principal players, writers, individual producer(s), ~~director and key technical personnel (director of photography, production designer, costume designer, composer, editor)~~directors prepared by the publicist assigned to the Picture. Biographies to be delivered as a Microsoft Word document.

D.   <u>Stories/Articles:</u>  Any publicity kits or stories written by the unit publicist on various aspects of events during production of the Picture, which are deemed by the unit publicist to be suitable for column placement and feature stories, if any, involving the principal players, supporting players, writer(s), and special interest material that the unit publicist has reason to believe will be of use in marketing the Picture.

E.   <u>Production notes:</u>  Notes on the production of the Picture prepared by the unit publicist, including history of the production; illuminating comments by the cast and key filmmakers about the Picture, its significance and its special claims on the interest of the moviegoers.  All Production Notes shall be read and approved by Grantor, the director and anyone else so designated by the Grantor before they are delivered to Licensee. Production Notes to be delivered as a Microsoft Word document.

F.   Synopsis:  A brief synopsis in the English language of the story of the Picture (one typewritten page in length). Synopsis to be delivered as a Microsoft Word document.

G.   Advertising Materials: One (1) copy of all advertisements, paper accessories and other advertising and publicity materials, if any, prepared by Grantor or by any other party in connection with the theatrical and home entertainment release of the Picture, including:

> (a) NTSC digital betacam tapes of the electronic press kit, Including interviews with the actors and other persons connected with the picture, featurette (if available) and B-roll behind-the-scenes footage of the actors and filmmakers working. Both PAL and NTSC masters must have separate audio channels each for narration, music, dialogue and sound effects (except for the B-roll footage). All music and usage rights used in the creation of these materials shall be cleared for worldwide use.

IV.   **Documentation**: *All paperwork shall be delivered in the English language.* All materials must be conformed to the international version credits.  Materials to be delivered to *Justin Lev at 626 La Loma Rd., Pasadena, CA 91105,* or such other address or individual as Licensee shall determine.

A.   Information Sheet: An information sheet in the form of Exhibit "D" containing technical specs in connection with the Picture.

B.   Combined Continuity and Spotting List: One (1) original typewritten copy and an electronic disc in the English language of a detailed, final dialogue and action continuity and spotting list of the Feature and Trailer that must conform to the detailed specifications as set forth in Exhibit "E". The document must contain all dialogue, narration and song vocals, as well as a cut-by-cut description of the Picture action, conformed to the Answer Print.  If the Picture was recorded in a language other than English, the Continuity shall contain a literal English translation.

Spotting list must give spot numbers for each subtitle, the footage of the start and end of the subtitle, indication of which character is speaking and the text.

Continuity List shall be delivered as a Microsoft Word document or Microsoft Excel document.

C.   Literary Materials: A copy of the story, screenplay and final lined shooting script of the Picture and other literary materials relating to the Picture.

D.  <u>Music Cue Sheet:</u>  One (1) typewritten original copy and one electronic of a music cue sheet substantially in the form of Exhibit "F", attached hereto, showing the particulars of all music contained in the Picture and any completed Trailers delivered hereunder, including title of each composition; the names of composers; publishers and copyright owners; the usages (whether instrumental, instrumental-visual, vocal, vocal-visual or otherwise); the place for each composition showing the film footage and running time for each cue; the performing rights society involved any other information customarily set forth in music cue sheets. Music cue sheet shall be delivered as a Microsoft Word or Excel document.

E.  <u>Music Contracts/Licenses/Assignments:</u> All licenses shall be delivered in a pdf format.  Each of the contracts, licenses, license confirmation letters or assignments specified below that conveys to Grantor the right to use the music, lyrics or recordings, as applicable, in the Picture, in whole or part, in all media now known or hereafter devised, throughout the universe in perpetuity without payment of any further compensation for the grant of such rights and shall include the right to use the music, lyrics or recordings, as applicable, in connection with the advertising, promotion and publicity of the Picture, in context of the Picture (and out of context, if available) subject only to payment of fees to applicable performing rights societies.

    (a)  Music and Lyric contracts:  Duplicate originals or legible copies of all contracts covering the acquisition and performance of all music and lyrics utilized in connection with the Picture;

    (b)  Music Licenses:  A copy of valid licenses paid for by Grantor for the full period of copyright for the synchronous recording of all copyrighted music and recordings in the Picture and the performance thereof in the licensed territory throughout the entire Term of the Agreement.

F.  <u>Composer Agreement(s):</u>  One (1) copy in a pdf format of the original fully executed contract for the services of the composer of the musical soundtrack of the Picture and the sync license from the publisher. Contract should cover all rights in all media in perpetuity.

G.  <u>Credit Statement:</u>  A complete written statement of all advertising  (paid and excluded ad) obligations. Such statement shall include the full text of all contractual credit obligations. A layout of all advertising credits in the form of a "billing block" is to be delivered. Credits must comply with all applicable guild and union requirements and the applicable individual employment agreements for any person or entity accorded credit therein. All credits shall be consistent with the customary policies of major motion picture Studios. The Credit Statement shall be signed and acknowledged

DelSched.05-0806-29-09 10:11 AMZ:30 PM
9

as accurate by the individual producer(s) of the Picture and by Grantor's production counsel. Credit Statement shall be delivered as a Microsoft Word or Excel document.

H.   <u>Director's Guild Credit Approval:</u>  If the Picture was produced under the jurisdiction of the Director's Guild of America ("DGA"), a letter from the DGA approving (a) the list of screen credits for the Picture submitted to the DGA pursuant to Article 8-201 of the DGA Basic Agreement, and if appropriate (b) the credits included in the paid advertising campaign material submitted to the DGA pursuant to Article 8-210 of the DGA Basic Agreement.

I.   <u>Writer's Guild Credit Approval:</u> Delivery of One (1) copy of the WGA Notice of Tentative Writing Credits and the Final Determination of writing credits.

J.   <u>Screen Credit Requirements:</u> One (1) typewritten list of the main and end credits of the Picture as they appear on the original negative with an approved lay-out illustration of the screen and advertising credits with relative size and prominence in percentage. Screen Credit Requirements shall be delivered as a Microsoft Word or Excel document.

K.   <u>Cast List & Crew List:</u>  One (1) copy of a list indicating the name of the character portrayed by each player, including appropriate contact numbers; and one (1) copy of a list of all technical personnel (including their title and assignment) involved in the production, including appropriate contact numbers.

L.   <u>Licenses/Contracts/Assignments:</u>  Duplicate originals of all licenses, contracts, assignments and/or other written permissions from the proper parties in interest permitting the use of any product, musical, literary, dramatic, copyrighted, trademarked and other materials of whatever nature used in the production, exploitation or advertising of the Picture including but not limited to service contracts, photographic releases, featurette clearances, rental contracts, location agreements and production contracts.

M.   <u>Sound Licenses:</u>  Executed copy of the License Agreement for worldwide use without limitations of Dolby, SDDS and DTS (or applicable stereo license) sound in connection with the Picture.

O.   <u>Employment Agreements:</u> ~~Duplicate originals (or photocopies~~ <u>Photocopies</u> or scanned copies~~)~~ of all documents relating to the employment of all personnel ~~engaged to render services in connection with the Picture, including but not limited to the individual producer(s), director, screenwriter(s), actors, musical performing artist(s), below the line crew, technicians and administrative staff.~~<u>credited in the main titles of the Picture.  If and when requested by Licensee</u>ƒ<u>, photocopies or scanned</u>

copies of all documents relating to the employment of any additional personnel engaged to render services in connection with the Picture.

P.    Residuals Information:  (If applicable) A statement from Grantor indicating all union, guild or federation agreements to which Grantor is a party, a complete list of all personnel (and lending companies, if applicable) rendering services in connection with the Picture who are entitled to residuals, together with all information necessary to complete payment of such residual obligations.  Grantor agrees to indemnify Licensee and hold Licensee harmless from and against any and all damages, losses or expenses incurred as a result of Grantor supplying Licensee with any incorrect, inaccurate or incomplete information.

Q.    Dubbing Restrictions/Approvals:  A statement of: (1) any limitation on use of photographic or non-photographic likeness (2) any restrictions as to the dubbing of the voice of any player including dubbing dialogue in a language other than the language in which the Picture was recorded (if applicable).

R.    Clearance Research Report: Provided to the insurance company prior to filming upon which the E&O insurance was secured.

S.    MPAA Rating Certificate:  A Grantor shall deliver to Licensee all materials necessary for Licensee to obtain a Certificate evidencing a rating from the Motion Picture Association of America ("MPAA") that is not more restrictive than "R rating" and written acknowledgement of the MPAA that all of its charges in connection with the Picture have been paid.  If an MPAA certificate is unavailable, Grantor shall deliver to Licensee all materials necessary for Licensee to obtain such a certificate.  If Licensee obtains such a certificate, the cost thereof will either be a Distribution Expense under the Main Agreement (if applicable), or will be billed to Grantor.

T.    [intentionally deleted]

U.    Certificates of Origin:  Ten (10) original Certificates of Origin certified and signed by a notary or Commissioner for Oaths, together with confirmation from the appropriate governmental agency (if origin is outside of the United States). The format of the Certificate of Origin must conform to Exhibit "G".

V.    French Authorship Certificate:  Two (2) original fully-executed French Authorship Certificates (substantially in the form of Exhibit "H" attached hereto).

W.    Short Form Assignment:  One executed copy of the Short Form Assignment of Distribution Rights.

DelSched.05-0806-29-09 10:11 AM7:30 PM
11

X.   Copyright Information:  Detailed information with regard to the copyright proprietor of the Picture, the precise copyright notice to be affixed to all advertising and packaging and, if available, a renewal date relating to the Picture, and copies of all copyright registrations or filings for such copyright registrations if registration has not yet been received by Licensor and assignments of copyright pertaining to the Picture.  Grantor shall provide Licensee with one copy of the U.S. Certificate of Copyright Registration.

Y.   Chain of Title:  One (1) copy of all documents evidencing Grantor's right to produce, distribute and exploit the Picture and all instruments or contracts covering the acquisition of literary, dramatic, music and other works and materials of whatever nature upon which the Picture may be based and/or used in the production of the Picture, including, but not limited to, copyright and title search reports, and publisher and individual releases as well as all transfer-of-rights agreements from the author to the Grantor.

Z.   Errors and Omissions Policy:  A copy of a "Motion Picture Grantor and Licensee Errors and Omissions" insurance policy from an insurance company acceptable to Licensee, which names Licensee and each of the parties indemnified in the Agreement as additional insured.  The policy shall provide insurance against any and all claims relating to the Picture and shall have limits of at least USD$3,000,000.00 with respect to any one claim relating to the Picture, USD$5,000,000.00 with respect to all claims relating to the Picture in the aggregate and the deductible of the Policy shall not exceed USD$10,000.00.  The Policy shall be for an initial period commencing as soon as reasonably practicable and in no event later than commencement of principal photography of the Picture and terminating no earlier than 5 years thereafter, with an option for an additional year and shall be delivered together with evidence indicating that the premium for the Policy has been paid in full for the applicable term.

AA.   Copyright Report and Title Report & Opinion:  A current (i.e. issued within six months of the date of the Agreement) Copyright Report and Opinion and Title report and Opinion issued by Thomson & Thomson/Brylawski, Leeds & Komen or Dennis Angel.

BB.   Paid Advertising Requirements:  A copy of the paid advertising requirements for the Picture (**"Paid Advertising Requirements"**), including a top sheet which indicates the exact placement, wording and size of each paid advertising credit, and a summary of all contractual and likeness requirements with respect to paid advertising.  The Paid Advertising Requirements shall be signed and acknowledged as accurate by the individual producer(s) of the Picture and by Grantor's production counsel.

CC.   <u>UCC-1 Forms</u>: UCC-1 Forms and searches showing no claims, conflicts, encumbrances, etc. regarding the rights granted to Licensee in the agreement.

DD.   <u>Approved Photography/Artwork Affidavit</u>: A signed copy of an Approved Photography/Artwork Affidavit certifying that all photography and key art delivered to Licensee has been approved by any person with contractual still or key art approval and that no additional payments shall be due under the photographer's agreement in connection with the use of the photography in marketing and advertising of the Picture.

EE.   ~~Production/Accounting Files: Access, if requested, to complete original master production office files and complete original master accounting files with a detailed inventory of said files.~~<u>intentionally deleted.</u>

FF.   <u>IATSE</u>: A completed IATSE Pension Plan Payment Percentage Proration form to be completed by the production accountant.

GG.   <u>Obligations</u>: Summary of lodging, travel and accommodation provisions from talent contracts regarding publicity services as well as all premiere and/or festival obligations including per diem requirements.

## LABORATORY ACCESS LETTER
### Exhibit "B"

Date:

*(Laboratory name and address)*

re: *(film title)*

To:  *(name of laboratory)*

1. Picture/Term/Territory: The undersigned, _____("Grantor"), has granted to Consolidated Pictures Group, Inc. ("Licensee") certain distribution rights in connection with the above-referenced motion picture (the "Picture") throughout _____ (the "Territory") for a duration of _____ years (the "Term").

2. Materials: The following materials (the "Materials") are currently on deposit with your facility:

*(List of materials.)*

During the Term, the Materials shall remain in your possession and under your control at your facility located at the address set forth above or at one of your satellite vault locations and shall not be removed without the express written consent of Grantor and Licensee. All materials ordered and manufactured by either party in accordance with this agreement may be removed from the laboratory without the prior written consent of the other party.

3. Licensee's Orders: This will authorize, direct and instruct you to fill all orders of Licensee or Licensee's designees at any time during the Term for duplicate material as Licensee or Licensee's designees shall request at the sole cost and expense of the ordering Licensee. Notwithstanding any claim or lien which you may now or hereafter assert against Grantor, Licensee or others or against the Picture or the Materials, you agree that you will not, by asserting or enforcing any such claim or lien, refuse to accept or perform any requests placed by Licensee or its designees as herein provided.

4. Irrevocability: The instructions, authorizations and directions herein contained in favor of Licensee are being relied on by Licensee and are coupled with an interest and may not be revoked, rescinded or in any way modified without the written consent of Licensee.

5. No Claim Against Licensee: You agree that you will not look to Licensee and will not assert any claim or lien, statutory or otherwise, against Licensee by reason of any obligation owed to you for any work, labor, material or service which you may perform at the expense of Grantor or designees of Grantor. You agree that you will not look to

DelSched.05-0806-29-09 10:11 AM7:30 PM
14

Grantor and will not assert any claim or lien, statutory or otherwise, against Grantor by reason of any obligation owed to you for any work, labor, material or service which you may perform at the expense of Licensee.

6. Facility Acknowledgment: By signing in the space provided below, you agree that: (i) you will fill all orders from Licensee or Licensee's designees, as the case may be, in accordance with the authority granted herein without regard to any outstanding invoices or obligation to you or Grantor or any third party and (ii) it will fill all orders from Grantor or Grantor's designees, as the case may be, in accordance with the authority granted herein without regard to any outstanding invoices or obligation to you or Licensee or any third party. You agree to be bound by the foregoing instructions and directions.

By signing below the signatories agree to all the terms and conditions set forth herein.

Sincerely,

_____ ("Grantor")

By: _____
Title: _____

Acknowledged and Agreed To:

("Licensee")

By: _____
Title: _____

_____
("Laboratory")

By: _____
Title: _____

MORTGAGE COPYRIGHT/SECURITY AGREEMENT
Exhibit "C"

## TECHNICAL SPECIFICATION FORM
### Exhibit "D"

Title:_____

Production Company: _____
Address: _____
Phone: _____ Fax: _____

Start Photography: Wrap Photography: _____ MPAA Rating: _____

Footage: _____ Running Time: _____ Aspect Ratio: _____ # of Reels:
_____

Sound: Dolby A ___, Dolby SR ___, Dolby SR-D ___, SDDS ____ DTS _____

Locations: _____

Producer(s): _____
Director: _____
Writer(s):_____
Director of Photography: _____
Editor: _____ Editor Phone: _____

Processing lab:_____ Contact (w/phone #): _____

Storage lab: _____ Contact w/phone #): _____

Titles:_____

Opticals:_____

Color timing lab:_____ Timer (w/ phone #) _____

Post Production Supervisor: _____ Phone #: _____

Negative Cutter: _____ Phone #: _____

Sound Facility: _____ Phone #: _____

Optical Track:_____

Composer:_____

Video Transfer Facility: _____Phone #: _____

Final Answer Print Creation Date: _____

COMBINED CONTINUITY SPOTTING LIST – TECHNICAL SPECIFICATIONS
Exhibit "E"

General Layout:  Delivered lists should contain both the combined continuity and subtitle spotting on the same page. Separate lists will not be accepted.  Delivered list must be reported in both foot & frame and running time code per reel formats.

Subtitle Spotting Line Width: Each line of a subtitle should not exceed 37 characters, with capitol letters counting as 2 characters. Punctuation and spaces should be included in the character count.

Subtitle Line Count: Each subtitle should not exceed 2 lines. Lines of dialogue which do not fit on a single card, should be carried on to multiple cards, each with it's own spotting footage and character attribution.

Space between titles: There must be a minimum of 4 frames between each subtitle.

Character Identification: All subtitles must be attributed to the character speaking the dialogue, and to whom they are addressing. If dialogue is treated as narration, and not spoken to a specific character, then the person being addressed should be identified as the "audience."

Title Numbering: All subtitles should be numbered in ascending order per reel, not one continuous numbered sequence for the entire film. The reel number should be part of the numbering sequence, followed by the title number. For example, the title numbers for reel 1 would run 1-1, 1-2, 1-3, etc. Reel 2 would be 2-1,2-2,2-3, etc.

Voice Over/Use Of Italics: Voice over should always be identified via a parenthetical (voice over) or (v.o.) next to the character attribution. Further, the phrase "ITAL" or "ITALICS" should be included with the title number for any subtitles containing voice over. The text of the spotting list itself need not be in italics, as long as the title number is identified as such.

Upon request, Sales Agent can provide dialogue continuity layout samples to help illustrate the above specifications.

DelSched.05-0806-29-09 10:11 AM7:30 PM
18

MUSIC CUE SHEET - SAMPLE FORMAT
Exhibit "F"

**MUSIC CUE SHEET - Sample format**

TITLE: _____     DATE: _____

FEATURE _____     PRODUCTION COMPANY: _____

COMPLETION DATE : _____     DISTRIBUTION COMPANY: _____

RELEASE DATE: _____

| | | MT=MAIN TITLE | | | EC=END CREDITS | | BV=BACKGROUND VOCAL | |
| | | VI=VISUAL INSTRUMENTAL | | | BI=BACKGROUND INSTRUMENTAL | | VV=VISUAL VOCAL | |

| REEL | CUE TITLE | SONG TITLE | USAGE | TIMING | PERFORMER | COMPOSER | PUBLISHER | SOCIETY |
|------|-----------|------------|-------|--------|-----------|----------|-----------|---------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## CERTIFICATE OF ORIGIN
### Exhibit "G"

TITLE:

TERRITORY:

AUTHORIZED LANGUAGE:

TERM OF LICENSE AGREEMENT:

ORIGINAL PRODUCERS:

PRODUCED BY (COMPANY):

FILMED IN (COUNTRY):

NATIONALITY OF FILM:

YEAR OF PRODUCTION:

SOLD TO:

SALES AGENT IN TERRITORY:

RUNNING TIME (minutes):

DIRECTOR:

CAST:

WRITER:


(Grantor)

By _____
(Name and title)


**(Notary seal)**

DelSched.05-0806-29-09 10:11 AM7:30 PM
20

## FRENCH AUTHORSHIP CERTIFICATE
### Exhibit "H"

### ATTESTATION D'AUTEUR
### AUTHOR'S CERTIFICATE


Je sousigne
(I, the undersigned)                    _____

demeurant                               _____
(address)
                                        _____

                                        _____


declare etre le seul auteur du scenario original non tire
d'une oeuvre anterieure.
(being the sole author of the original screenplay not being taken from any previous work.)


intitule:                               _____
(entitled)

et authorise                            _____
(and authorize)

a produire et exploiter un film de cette oeuvre.
(to produce and distribute a film based on this work)

Le presente autorisation est accordee pour une duree de: perpétuité.
(The present authorization is given in perpetuity)


                    _____
                    Signature of Author

## GENERAL TECHNICAL NOTES FOR SOUND DELIVERY
### Exhibit "I"

<u>Pull Ups</u>: All sound delivery elements, including stems, must have pull-ups at the end of reels.

<u>Tail Pops</u>: All reels (except the last reel) for all sound delivery elements must have tail pops. For example, if a film has 5 reels, reels 1-4 would have tail pops and reel 5 would not.

<u>Tones</u>: Tones must be included on the head of all reels. A separate tone roll will not be accepted, nor will we accept tones only on reel 1.

<u>D/M/E "2" Pop</u>:  The 2 pop on the DME must occur on all three tracks.

<u>35mm Magnetic</u>:
• All items delivered on 35mm mag stock must have SR noise reduction.
• There must be **no splices** anywhere between the Academy start and the tail pop.
• There must be start marks on all reels.

<u>Digital Tape</u>:
• All items delivered on digital tape shall have **no** SR noise reduction.
• All items delivered on digital tape must have 29.97fps non-drop frame time code with a program (film) speed of 23.97 fps, or 30 fps non-drop frame time code with a 24fps program speed so it can be sunk to either film or NTSC videotape.
• 00:00:00 shall be on the Academy start, with the 2 pop falling on 00:00:06. Sales Agent Entertainment **will not** accept time code that zeros at the FFOA.
• Only one reel per tape.

<u>DEPOSIT LETTER</u>
Exhibit "J"

Date: _____

(Laboratory or Facility)
ADDRESS

Attn:
        Re: "I LOVE YOU PHILLIP MORRIS" (the "Picture")

Dear Gentleman:

Please be advised that [PRODUCER] ("Producer") has entered into an agreement ("Agreement") with Consolidated Pictures Group INC ("CPG") in connection with the Picture.  Pursuant to the Agreement, Producer is hereby depositing the following elements (the "Materials"), at your facility to be held in the name of CPG for the duration of the Term (as defined in the Agreement).

        1. (List the materials)
        2.

Please acknowledge the following by signing where indicated below:

        a) The Materials are currently in your possession
        b) Producer has fulfilled all payment obligations in connection with the Materials
        c) The Materials are not subject to any liens
        d) The Materials are not subject to any third party access arrangements
        e) You will henceforth hold the materials in the name of and to the sole benefit of CPG
        f) You shall not grant access to the Materials to any third party(s) without the express written
          approval of CPG

                                Very truly yours,
                                Producer

                                By: _____ Its:

Acknowledged and agreed:
Laboratory

By: _____ Its:


By: _____ Its:


DelSched.05-0806-29-09 10:11 AM7:30 PM
23

**45**

## ANSWER PRINT/CHECK PRINT APPROVAL
### Exhibit "K"

Date: _____

Consolidated Pictures Group INC.

     Re: "I LOVE YOU PHILLIP MORRIS" (the "Picture")

Dear Gentleman:

    I, _____, hereby confirm that I am the Director [*DP, Editor*] of the Picture, which was produced in _____ by _____.
On the dates indicated, I personally viewed and approved Reel #'s 1-__, of [*the final approved 35mm Composite Answer Print printed on Kodak stock and manufactured from the original negative*] -or - [*the 35mm Composite Check Print #__, printed on Kodak stock, and manufactured from the from 35mm Inter-Negative #__*].

    I confirm that the color, density, overall quality, and content of each of these reels fully meets my creative and technical standards.  Furthermore, I acknowledge that this approved [*Answer Print/Check Print*] can be used as a guide for the manufacture of Release Prints.

Reel #1 approved *[date]*      Reel #3 approved *[date]*      Reel #5 approved *[date]*

Reel #2 approved *[date]*      Reel #4 approved *[date]*      Reel #6 approved *[date]*

                 Approved:

                 By:_____
                 Director [*DP/Editor*]

*[If either DP or editor is signing this letter, then Director must authorize by signing below]:*
I, _____, Director of the Picture, hereby authorize _____, the [*DP/Editor*]
of the Picture to approve the element(s) set forth above on my behalf.

By: _____
· Director

## APPROVED PHOTOGRAPHY/ARTWORK AFFIDAVIT
### Exhibit "L"

_____, being duly sworn, deposes and says:

1. I am the _____ of _____ (the "Company").
2. I am authorized to make this Affidavit in connection with the motion picture entitled _____ (the "Picture").
3. I attest to the fact that all photography, key art and related materials (the "Photography") delivered to CPG by or under the control of Company were previously approved by all persons identified therein, as well as by all individuals entitled to contractual approval rights under their employment and/or service agreements. Further, there shall be no additional payments due to, or rights to be secured by any third parties for the use of any the Photography in connection with CPG's and/or its licensees', subdistributors' or assigns' marketing and advertising efforts in connection with the Picture.

IN WITNESS WHEREOF, I have hereto set my hand this ___ day of _____, 20___.

By: _____
Its:

STATE OF              }
                      } ss:
COUNTY OF             }

On this _____ day of _____, 20____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is (are) subscribed to the following instrument and acknowledged to me that _____ executed the same.
IN WITNESS WHEREOF, I have hereunto set my hand and annexed my official seal this _____ day of _____, 20____.

                                          Notary Public

<u>CHECKLIST FOR</u>
<u>PRORATION OF POST 60'S & SUPPLEMENTAL MARKET MONIES</u>
<u>I.A.T.S.E. AND BASIC CRAFTS AGREEMENTS</u>
Exhibit "M"

FORM D - ANSWER PRINT
DELIVERED ON OR AFTER
NOVEMBER 1, 1990

The following proration form is to be completed by the Auditor at the conclusion of principal photography and submitted to the Senior Auditor.  It establishes the number of days of principal photography out of the country and inside or outside the thirteen (13) western states (Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Texas, Utah, Washington and Wyoming).  The results determine whether the production qualifies for a reduction in contributions to the Motion Picture Industry Pension and/or Health Plans as they pertain to Supplemental Markets and Post 60's revenues.

Principal Photography Dates:

Name of Production Company:

Name of Payroll Company & Contact:

Production Name:

Production Number:

Estimated Delivery Date of Answer Print:

The Producer - IATSE AND M.P.M.O. Basic Agreement of 1993 provides that the Producer shall pay a percentage payment to the Motion Picture Industry Health and/or Pension Plan based on the gross receipts from the sale, lease, license or distribution of a theatrical motion picture on free television and on the gross receipts from the sale, lease, license or distribution of a television motion picture in supplemental markets when two (2) or more individuals employed under the Agreements with the Local Unions listed in Exhibit A-1 and A-2 (see attached) are employed on the motion picture.  The Basic Agreement also gives the Producer the right to prorate the percentage payment if certain conditions are met.  Completion of the following questions will provide the necessary information to determine whether a motion picture qualifies for proration.

**1. Basic Requirements**

Were two (2) or more employees working in the picture covered under the I.A.T.S.E. West Coast Studio Local Agreements and/or Basic Craft Agreements (see Exhibit A-1 and A-2) during pre-production or principal photography?

Yes _____   No _____
If the answer is **Yes**, proceed to question #2; if the answer is **No**, you do not need to answer any of the remaining questions on this form.  Sign and return this form to your Senior Auditor.

**2. "Foreign" Qualifications**

DelSched.05-08~~06-29~~-09 ~~10:11 AM~~7:30 PM
26

**48**

a.    Total number of shooting days of principal photography:

b.    Total number of shooting days of principal photography which took place in a country other than the United States, it's territories or Canada:

c.    Divide (b) by (a).  This number represents the percentage of principal photography shot in a country other than the U.S., it's territories or Canada:

d.    Is the answer to (c) 20% or more?  (i.e., did 20% or more of the shooting days of principal photography take place in a country other than the U.S., it's territories or Canada?

If the answer to (d) is **Yes**, this production meets the requirements for proration for a foreign motion picture qualification; proceed to question #4, "Proration".  If the answer to (d) is No, proceed to Question # 3A, "Domestic" Qualifications, on this form or to # 3B if this is a motion picture which was filmed within the thirteen (13) western states and utilized two (2) or more employees, but only from the unions listed in Exhibit A-2 (Basic Crafts).

**3A. "Domestic" Qualifications - IATSE only or IATSE and Teamsters/Basic Crafts**

a.    Total number of shooting days of principal photography:

b.    Total number of shooting days of principal photography occurring outside the following states: Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon Texas, Utah, Washington and Wyoming:

Provide a list of those states outside the 13 western states and the # of days where filming took place:

c.    Divide (b) by (a).  This number represents the percentage of principal photography shot outside the 13 western states: _____

d.    Is (c) more than 50% (i.e., did a majority of the shooting days of principal photography take place outside the 13 western states?   Yes _____   No _____

If the answer to (d) is **No**, you do not need to complete any of the remaining questions on this form.  Sign and return the form to your Senior Auditor.  If the answer is **Yes**, proceed to Question 4(a-1).

**3B. Domestic Qualifications - "Teamsters/Basic Crafts Only" Motion Pictures** (Applies to films shot within the 13 western states on which only Teamsters/Basic Crafts employees were employed)

a.    Were any of the employees working on the production crew of the picture during pre-production or principal photography covered under the Agreements with the Local Unions listed in Exhibit A-2?
                                          Yes _____   No _____

If the answer to (a) is **Yes**, proceed to (b) below.

b.    Total number of shooting days of principal photography:
                                          Yes _____   No _____

c.    Total number of shooting days of principal photography which took place inside the following states: Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon Texas, Utah, Washington and Wyoming:
                                          Yes _____   No _____

d.    Divide (c) by (b).  This number represents the percentage of principal photography shot inside the 13 western states:
                                          Yes _____   No _____

e.    Is (d) more than 50% (i.e., did a majority of the shooting days of principal photography take place inside the 13 western states)?
                                          Yes _____   No _____

If the answer to (e) is **No**, this production does not meet the requirements for proration for a "Teamsters/

Basic Crafts only" production and unless the production can qualify under section 3A above, proration is not permitted.  Sign and return the form to your Senior Auditor.

If the answer to (e) is Yes, proceed to question (f).

f.      What was the number of individuals on the Los Angeles production crew who were hired under the jurisdiction of the Teamsters/Basic Crafts Unions?

g.      Of the number identified in response to (f) above, how many were either make-up artists, hairdressers or costumers who were specifically required to be furnished by the Producer in accordance with the personal service contract of an actor or were engaged in post-production or distribution functions (including but not limited to, editing and looping regardless of where and when those functions were permitted)?

h.      Subtract the number in (g) from the number in (f) above:

If the answer to (h) is more than 29, proration is not permitted.  Sign and return the form to your Senior Auditor.

i.      If the answer to (h) is 29 or fewer, list the number of such individuals and identify the category, and proceed to Question 4(a-2) below.

**4. Proration - IATSE only or IATSE and Teamsters/Basic Crafts**

a-1.    For pictures qualifying under 3A above (IATSE only or IATSE and Teamsters/Basic Crafts): Total salaries paid - excluding fringe - to those individuals subject to the Basic Agreement or covered under the jurisdiction of the Basic Crafts (Exhibit A-1 and A-2 attached). Exclude the salaries of persons working in distribution which includes all laboratory work other than that performed by employees charged directly to the picture*.

        *If production salaries for a foreign production are not readily available, the Auditor may use the number of employees instead.

a-2.    For pictures qualifying under 3b above (Teamsters/Basic Crafts only):  Total salaries paid - excluding fringe - to those individuals subject to the Teamsters Local 399 Agreement and the other Basic Crafts Agreements (Exhibit A-2 attached). Exclude the salaries of persons working in distribution which includes all laboratory work other than that performed by employees charged directly to the picture. _____

b.      Total salaries of the entire below-the-line production crew - excluding fringe - for all persons working in job categories referred to in the IATSE West Coast Studio Local or Basic Crafts Agreements. Exclude the salaries of persons working in distribution which includes all laboratory work other than that performed by employees charged directly to the picture.* _____

c.      Divide (a-1) or (a-2) by (b):

                                                                        _____ %

d.      The answer to (c) is the proration factor to apply in submitting the required percentage payment.

**Please supply supporting documentation (i.e., payroll registers or payroll summaries) for answers to 4(a-1) or 4(a-2) and 4(b) above.  This questionnaire and all supporting documentation must be forwarded to the Residuals Department upon completion of principal photography.**

DelSched.05-08~~06-29-09~~ ~~10:11 AM~~7:30 PM

28

This production does _____ does not _____ meet the qualifications for proration for foreign motion pictures.

This production does _____ does not _____ meet the qualifications for the qualifications for domestic motion pictures on which the Los Angeles production crew consists of persons covered under the IATSE Basic Agreement only or under the IATSE Basic Agreement and the Basic Crafts.

This production does _____ does not _____ meet the qualifications for domestic motion pictures on which the Los Angeles production crew consists only of persons covered under the Studio Transportation Drivers, Local #399 Agreement and the Basic Crafts Agreements.

Name: _____     Signature: _____     Date: _____
    (please print)
    Responsible for questions  1 - 4

Name: _____     Signature: _____     Date: _____
    (please print)
    Responsible for questions  1 - 4

DelSched.05-08~~06-29~~-09 ~~10:11 AM~~7:30 PM
29

## CERTIFICATE OF AUTHORSHIP
### Exhibit "N"

The undersigned ("Writer") does herby certify that for good and valuable consideration, receipt of which is hereby acknowledged, all literary material submitted by Writer in connection with the motion picture entitled _____ was written and created by Writer as a work- for-hire for _____ (the "Employer") pursuant to that certain Agreement dated as of _____, and that the Property is deemed to be a work made for hire for Employer as defined in the United States Copyright Act of 1976, and Employer shall own all th results and proceeds of Writer's services hereunder, with Employer being deemed the author of the Property and entitled to the copyright (and all extensions and renewals of copyrights) therein and thereto and having the right to make such changes therein and such uses thereof as Employer may from time to time determine.  The undersigned, hereby represents and warrants that the property is not in the public domain, and does not defame, infringe upon or violate the rights of privacy or other rights of any person, firm or corporation and is not the subject of any litigation or claim that might give rise to litigation and I agree to indemnify Employer, its assignees and licensees, against any breach of any of the aforesaid warranties and undertake to execute such documents and do such acts and deeds as may be required by Employer or its assignees or licensees to further evidence or effectuate its rights hereunder.  Employer's rights in the Property may be freely assigned and licensed and its rights shall be binding upon me and inure to the benefit of such assignees and licensees.

IN WITNESS WHEROF, I have hereto set my hand this ___ day of ___ 20__.

STATE OF                    }
                           } ss:
COUNTY OF                  }

On this _____ day of _____, 20____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is (are) subscribed to the following instrument and acknowledged to me that _____ executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and annexed my official seal this _____ day of _____, 20____.

                                        Notary Public

DelSched.05-0806-29-09 10:11 AM7:30 PM
30

**52**

## AFFIDAVIT
### Exhibit "O"

_____, being duly sworn, deposes and says:

1.    I am _____ of _____ (the "Company").

2.    I am authorized to make this Affidavit in connection with the motion picture entitled _____ (the "Picture").

3.

4.    I attest to the fact that all costs in connection with the Picture have been paid and there are no liens, encumbrances or claims in or to the Picture, and that Consolidate Pictures Group INC. ("CPG"), its successors, licensees and assigns shall have quiet enjoyment of all of the rights acquired by CPG from the Company.

By: _____

Its: _____

STATE OF               }

                      } ss:

COUNTY OF           }

On this _____ day of _____, 20_____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is (are) subscribed to the following instrument and acknowledged to me that _____ executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and annexed my official seal this _____ day of _____, 20____.

Notary Public

# EXHIBIT D

**AMENDMENT TO LICENSE AGREEMENT: "I LOVE YOU PHILLIP MORRIS"**

As of February 25, 2010

Reference is hereby made to that certain License Agreement dated as of May 8, 2009, between Consolidated Pictures Group, Inc., and EuropaCorp, with respect to the distribution of the motion picture currently entitled, "I Love You Phillip Morris." Capitalized terms herein shall have the same meaning as in the Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties ("Parties") agree to amend the Agreement as follows, as of the date first set forth above:

1) Notwithstanding anything to the contrary in the agreement (including Paragraphs 8 and 10 thereof) Grantor and CPG acknowledge and agree that the final cut of the Picture which will be released by CPG in the Territory will be the cut which was rated "R" by the MPAA on August 24, 2009, and that Grantor shall only be required to deliver that version of the Picture;

2) CPG acknowledges that as of February 1, 2010, Grantor was no longer under any obligation to refrain from distributing the Picture outside the Territory;

3) CPG acknowledges that delivery of the Picture has been completed and hereby fully releases and discharges Grantor from any and all claims, known or unknown, arising from any delay in completing such delivery (and waives the benefit of § 1542 of the California Civil Code in connection with such claims to the fullest extent of the law); ·

4) CPG agrees that in no event shall the theatrical release of the Picture in the Territory be delayed beyond May 28, 2010;

5) Concurrently with the execution of this amendment, CPG will provide Grantor with (a) a notice of irrevocable assignment and acceptance, in form and substance acceptable to Grantor, executed by CPG and GF Capital Management and Advisors, LLC ("GF Capital"), with respect to the payments in Paragraph 6 below; and (2) a notice of irrevocable assignment and acceptance, in form and substance acceptable to Grantor, executed by ·CPG, with respect to the payments in Paragraph 6 below.

6) Provided the documentation described in paragraph 5 above is received by Grantor, then the following payment schedule for the $3 million Advance shall replace the schedule set forth in paragraph 5 of the Agreement, and no portion of the Advance shall be placed in escrow at CAA or elsewhere:

    a)     U.S. $1 million (the "First Installment") shall be paid to Grantor immediately;

    b)     U.S. $1 million (the "Second Installment") shall be paid to Grantor upon CPG's receipt of the second tranche of its financing from GF Capital, but no later than 30 days following payment of the First Installment; and

    c)     U.S. $1 million (the "Third Installment") shall be paid to Grantor upon CPG's receipt of the third tranche of its financing from GF Capital, but no later than 60 days following payment of the First Installment and in no event later than April 30, 2010.

Notwithstanding the foregoing, CPG will use good faith efforts to pay U.S. $1.5 million as the Second Installment (and $500,000 as the Third Installment) should the cash-flow requirements of the advertising campaign for the Picture permit, but no failure to pay more than $1 million as the Second Installment shall be deemed a breach hereof. For avoidance of doubt, subject to paragraph 18 of the Agreement, under no circumstances may the Picture be released in the Territory prior to full payment of the Advance.

Except as modified by the foregoing, the Agreement is unchanged and fully effective.

ACCEPTED & AGREED:

CONSOLIDATED PICTURES GROUP, INC.        EUROPACORP

by:                                       by:
its:                                      its:

2

55